## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## CENTURY MORTGAGE CO., LTD., Gateway Valley Estates, Inc., Market Fund Corp., Johney B. Kearney, Johney B. Kearney, Jr., Rex D. Parsons, Timothy R. White, Stephen R. Gilliland, Harald E. Singer, and D. Michael Russell, Defendants.

### No. C 77–0049.

United States District Court, D. Utah, C. D.

Dec. 26, 1978.

---

# MEMORANDUM OPINION AND ORDER

ALDON J. ANDERSON, Chief Judge.

This SEC action for injunctive relief came on before the court for hearing in February and March of 1978. Pursuant to stipulation of the parties, the hearing was a consolidated trial of the SEC's motion for preliminary and permanent injunctions against defendants Stephen R. Gilliland and Timothy R. White. Permanent injunctions were previously entered against all other defendants, either by default or by consent (without conceding responsibility).

## JURISDICTION AND VENUE

The parties stipulated in the pretrial order that this court has jurisdiction under 15 U.S.C. §§ 77v(a) and 78aa and that under those statutes venue is properly laid in this court.

## HISTORY OF CENTURY MORTGAGE CO., LTD.

Century Mortgage and Holding Co., Inc. was incorporated in Utah on September 11, 1975. An amendment to its articles of incorporation was executed on October 18, 1975, and filed with the Utah Secretary of State on December 8, 1975. (Exhibit 35). This amendment, inter alia, changed the corporate name to Century Mortgage Co., Ltd. (hereinafter Century). The incorporators and directors of Century were Johney B. Kearney (hereinafter Kearney), Johney B. Kearney, Jr., and Patricia K. Kearney. Kearney was the sole shareholder of Century from its inception until approximately October of 1976. He was also its president from its inception until March or April of 1976. (Exhibits 6, 7 and 9).

Although Kearney was apparently engaged in some advertising and other activity during the summer of 1975, Century engaged in no financial activity prior to its incorporation in September, 1975. (T‐Korb, 4:94–95) *. Kearney met with Gilliland, an attorney at law, in August of 1975, when Gilliland agreed to represent Kear-

Robert H. Davenport, Denver, Colo., G. Gail Weggeland, Delano S. Findlay, Salt Lake City, Utah, for plaintiff.

Ralph J. Hafen, Salt Lake City, Utah, for Timothy R. White.

O. Robert Meredith, Salt Lake City, Utah, for Stephen R. Gilliland.

* *I. e.,* testimony of Korb, fourth trial day (March 3), pages 94–95 of transcript. Trial days were:

(1) Feb. 14, (2) Feb. 17, (3) Mar. 2, (4) Mar. 3, (5) Mar. 7, (6) Mar. 8.

ney's proposed corporation in the preparation and registration of an intrastate offering of debt securities (later designated as "Century Capital Notes"). In preparation for the offering, Century procured the services of Harald Singer, a certified public accountant, in November, 1975. At that time, Singer prepared two certified financial statements: one for September 30 (Exhibit 2) and one for October 31, 1975. The October 31 statement was included in Century's prospectus of December 8, 1975, for the offering of $250,000 of Century Capital Notes. (Exhibit 6).

The sole purpose of the September 30 financial statement was, in Gilliland's words, "to insure compliance with Rule 147, promulgated by the United States Securities and Exchange Commission under § 3(a)(11) of the Securities Act of 1933, as amended [15 U.S.C. § 77c(a)(11)]; particular [sic] § 2(c)(ii) [sic: refers to 17 C.F.R. § 230.147(c)(2)(ii)] of that Rule." (Exhibit 37). Rule 147 sets forth "safe harbor" provisions, under which the intrastate exemption from SEC registration requirements may be assured. Among other requirements, Rule 147 requires that the issuer have

> at the end of its most recent semi-annual fiscal period prior to the first offer of any part of the issue, at least 80% of its assets . . . located within such state or territory . . . . .

17 C.F.R. § 230.147(c)(2)(ii). It is undisputed that over 80% of the assets included in the September 30 financial statement were located in Utah. On October 31, however, only 12% of Century's assets were located in Utah. (T–Singer, 2:63). Singer prepared both financial statements at the same time in November. (Id. at 15–19). The designation of September 30 as the end of Century's fiscal year was arbitrary. Century had no revenue and no financial activity prior to September, 1975. That date was selected solely to avoid the registration requirements of the federal securities laws.

The September 30 financial statement was fraudulent. It indicated that Century's total assets at that time amounted to $23,-

122. That figure was arrived at as follows: Kearney, with the assistance of White, obtained a check for $5,100 from Ben Aoyagi to Century on September 18, 1975, in return for Century's promise to assign him a first mortgage paying 12% interest and a promise that Century would make the payments on a parcel of land Aoyagi was buying until the 12% mortgage was assigned to him. (Aoyagi Affidavit and Testimony). Kearney obtained an additional $6,000 from Lloyd P. Winn, a 72-year-old widower, and $6,000 from his son, Lloyd B. Winn, on September 23, 1975. The Winns invested this money in exchange for a promise that Century would assign them first mortgages paying 12% interest. (Winn Affidavit). No mortgages were ever assigned to Aoyagi or the Winns. When Singer prepared the financial statement for September 30, he added the $17,100 from Aoyagi and Winns to $6,022 of expenditures for office space, travel, etc. by Kearney prior to September, reaching a total of $23,122. (Exhibit 3). This was the amount reflected on the financial statement as Century's total assets and as total stockholder's equity, all of which was stated to have been *contributed by Kearney in cash.* No liabilities were included in the statement despite Century's obligations to Aoyagi and Winns. On the financial statement $9,669 of the assets were identified as organization costs. This amount apparently represented miscellaneous expenditures by Kearney from March 15 to September 30, 1975. (Exhibit 2).

Knowing that the assets shown on the September 30 statement were not sufficient to satisfy the requirements of the Utah Securities Commission, Gilliland included the October 31 statement in Century's registration materials submitted to the Commission on December 3, 1975. (T–Gilliland, 3:102). Nearly all of the assets included in that statement were outside Utah. Moreover, that statement was grossly fraudulent. In addition to the false information carried over from the September statement, the October statement contained numerous other fraudulent representations and omissions.

Of the $29,884 cash reported in the October 31 statement, $21,849 consisted of two checks deposited by Kearney in Century's account on October 30, immediately before the financial statement was prepared. (T–Korb, 4:96–97; T–Singer, 1:20). One check was for $14,549 from Bancor, Ltd., an Okinawa corporation. This check was never paid because the account on which it was written had been closed five months previously. The other check, for $7,300, was from T. J. O'Reilly. It was never paid because O'Reilly's account lacked sufficient funds. O'Reilly's undisputed testimony reveals that Kearney requested this check from O'Reilly "to complete an audit." O'Reilly told Kearney that he did not have $7,300, and Kearney assured him that Century would transfer that amount by wire to O'Reilly's bank in Arizona to cover the check. No transfer was ever made to O'Reilly's bank. (T–O'Reilly, 3:39, 40).

Even more egregious was the treatment of certain real property included in the statement at $414,800. The statement indicated that the total encumbrances on this property were $97,479.65. In fact, the encumbrances on the property and undisclosed reductions in the purchase price totaled approximately $414,800. (T–Korb, 4:100). Thus, the financial statement indicated a net contribution to capital of about $317,000 by way of this real property when in fact its net contribution was zero.

A further misrepresentation in the financial statement is the inclusion of contracts receivable at $60,876, represented to be "fully collectible." Of this sum, $43,200 was based on nine installment land contracts purporting to transfer 80 acres of land from White to a partnership known as O'Brien & Associates, of which White was a partner. (T–Singer, 1:49–52). White assigned the right to collect the payments under these contracts to Kearney, who in turn assigned the contracts to Century. (Exhibit 4). These contracts were a sham. White did not own the 80 acres but merely held an option, purchased for $10, to buy the land for $4,800. (Exhibit 50). The option was never exercised. The selling price for all nine contracts totaled $48,000 while

the actual value of the land was not more than $6,400. (T–White, 5:92–93). White received no consideration for his assignment of the contracts to Kearney. (T–White, 5:69). White's role in this and other transactions will be discussed more fully below.

Gilliland incorporated the fraudulent October 31 financial statement into the prospectus that was submitted to the Utah Securities Commission on December 3, 1975. The prospectus contained other serious misrepresentations. It included a statement that if the $250,000 issue of notes was fully sold, Century would have assets equal to 225% of the face value of the notes. (Exhibit 6, page 3, ¶ 2). In view of the foregoing exposition of the falsity of Century's financial statement, the corporation probably could not have had assets equal to even 100% of $250,000 after deducting selling expenses and operating expenses during the offering. The prospectus states that 42,470 shares of stock had been issued to Kearney for tangible consideration of $10 per share (totalling $424,700). (Id. at 3–4). In fact Kearney personally contributed very little of real value to Century. The prospectus stated that all of the net assets of Century as of October 31, 1975, were subordinated to the notes offered in the prospectus and that all assets purchased with proceeds from the offering would be subordinated to the notes sold. (Id. at 4). In fact, other than a meaningless resolution of the board of directors, no steps were taken to subordinate Century's assets to the notes. There was no indenture trust agreement, no escrow, no trust arrangement of any kind, and no filing of liens or mortgages. There was no security for the notes. (T–Gilliland, 3:53–54). Although the prospectus originally said the notes were "unsecured debt obligations," (Exhibit 6, page 6) Gilliland caused an amendment to be filed, as a result of which a sticker was affixed to the prospectus stating that the notes were "secured debt obligations." (Exhibit 6–B; T–Gilliland, 3:51).

The Utah Securities Commission gave clearance for the first issue of notes on December 8, 1975. (Sargent Affidavit).

That issue was fully sold by March 18, 1976, but Century continued selling the notes without interruption. (Exhibit 16). Singer prepared a certified financial statement as of March 15, 1976. Gilliland incorporated this statement into the April 2, 1976, prospectus for Century's second issue of notes. (Exhibit 7). The March financial statement contained most of the fraudulent representations and omissions that characterized the October 31 statement. The second prospectus was essentially the same as the first. Although the language claiming an asset/note ratio of 225% was not included, the prospectus stated that Century "will possess assets sufficient to redeem all of the notes." (Exhibit 7, page 3, par. 2). It stated that the notes were secured and that all of the corporate assets were subordinated to the notes. (*Id.* at 4, 6).

The April prospectus listed Michael Russell as president instead of Kearney. (*Id.* at 4). This change was apparently made because Kearney had been indicted by a federal grand jury in Arizona for wire fraud. Donald Lightner, who was employed by Century as sales manager, testified in his deposition (partially read into evidence at trial) that Gilliland called him in February of 1976 to inform him that Kearney had been charged with criminal fraud in Arizona. (Depo-Lightner at 26–28). Lightner also testified that he met with Gilliland and Kearney several days after the telephone conversation and discussed the fact that there were possible criminal charges pending against Kearney. (*Id.* at 28–30). Gilliland denied that the telephone conversation ever took place. He testified that he first learned of Kearney's indictment in early April. (T–Gilliland, 3:143–44). When asked if he amended the April prospectus to indicate that Kearney was charged with fraud, Gilliland replied, "No, I didn't. Mr. Kearney was no longer an officer. It was my information at the time that he was terminally ill." (*Id.* at 145). Although Kearney was no longer president of Century, he remained a member of its board of directors and its sole shareholder. He also remained in control of Century as a practical matter. In April and May Kearney appropriated at least $190,000 of Century's funds and diverted them to his personal use. (T–Korb, 4:142–146).

The April prospectus also stated that Century was not affiliated with any other companies and had no subsidiaries. (Exhibit 7, p. 3). Contrary to this assertion, Century was closely affiliated with several other corporations as of April, 1976. One such corporation was Singer Enterprises Corporation, which was incorporated on January 23, 1976. An amendment to its articles was executed on January 30 and filed with the Secretary of State on February 13, changing the corporate name to Gateway Valley Estates, Inc. (Exhibit 42). Curiously, this procedure of incorporating under one name and almost immediately amending the articles to change the name was used in the formation of both Century and Gateway. Although Gilliland testified that he did not incorporate Singer Enterprises, (T–Gilliland, 3:82, 87) the evidence is persuasive that he did so. Gilliland billed Century on February 3 for the "Formation of Singer Enterprises" and on March 3 for "Singer name change." (Exhibit 43). O'Reilly, one of the incorporators of Gateway (as was his wife), testified that Kearney hired Gilliland to incorporate Gateway, that he and his wife signed resignations at the same time they signed the articles of incorporation, and that Kearney told O'Reilly that he was involved in Gateway to create the appearance that Gateway's dealings with Century were at arm's length. (T–O'Reilly, 3:23–25). O'Reilly testified that Gilliland was present when Kearney made that statement. (*Id.* at 25). No stock of Gateway was ever issued. (T-Gilliland, 4:21).

Although Gilliland testified that Gateway was not affiliated with Century (T–Gilliland, 4:20), this testimony is wholly incredible. Century paid Gilliland's legal fees for Gateway's activities. (*Id.*, 3:84–86). Century and Gateway used the same business address, offices, and telephone number. (Exhibits 31 and 33). On January 23, 1976, the date of Gateway's incorporation (as Singer Enterprises), a "Purchase Agreement" (Exhibit 63) was entered into be-

tween an outside corporation (Gateway, Inc.) and Singer Enterprises. Kearney, Lightner, and Century signed the agreement as guarantors for Singer Enterprises. Under this agreement, certain land was sold to Singer Enterprises (later called Gateway). Gateway subdivided the land and entered into installment land contracts with buyers. It then assigned its right to receive payments under those contracts to Century at an abnormally deep discount of 50%. (T–O'Reilly 3:27–28). Kearney used Gateway as a conduit to siphon off at least $190,000 of Century funds for his personal use. (T–Korb, 4:142–45).

Two other corporations affiliated with Century were Med-Idents, Ltd. and Computer-Idents, Ltd. These corporations were originally Arizona companies owned by Kearney. (T–Gilliland, 4:9). Gilliland prepared the articles for incorporating them in Utah. (*Id.*) The articles were executed on March 16 but not filed until May 19. (Exhibits 57 and 58). A Century check to the Utah Secretary of State for $100, dated March 16 and marked "Incorporating" (Exhibit 13), was delivered to the Secretary of State on May 19 and negotiated on May 20. A Century check for $16,000, dated March 16, was used to make a wire transfer of that amount to Allen Bickart, an Arizona attorney, purportedly for the purchase of one or both of these corporations. (Exhibit 13; T–Hall, 4:48). These funds were actually used by Bickart to refund the investments of persons Kearney had defrauded in Arizona. (Depo-Bickart at 5–9). It was those fraudulent activities for which Kearney was indicted and ultimately jailed. Kearney apparently repaid the money in the hope of avoiding prosecution or receiving consideration on sentence.

Thus, it is clear that Century was closely affiliated with (if not the alter ego of) three other corporations when the April prospectus was filed. Gilliland was intimately involved in the formation of these corporations and knew of their existence and Century's involvement with them prior to April, 1976. Yet he stated in the prospectus that Century was affiliated with no other corporations and had no subsidiaries.

A further serious defect in the April prospectus is the representation that the notes were exempt from federal registration requirements by virtue of the intrastate exemption provided by Rule 147. Even if Century's arbitrary selection of September 30, 1975, as the end of its fiscal period were countenanced for purposes of qualifying the first issue, it is obvious that Century did not satisfy Rule 147 as of April 2, 1976, the date of the prospectus for the second issue. As of that date, Century's "most recent semiannual fiscal period" had ended March 31, 1976. As of that date only about 30% of Century's assets were located within Utah (T–Singer, 2:63,64), whereas Rule 147 required 80% of its assets to be in Utah. 17 C.F.R. § 230.147(c)(2)(ii). Gilliland was clearly aware of the need to satisfy the 80% requirement because he included Century's September 30 financial statement in the registration materials submitted to the Utah Securities Commission and a letter dated March 30 (Exhibit 38) stating that the purpose of the September statement was "to insure compliance with Rule 147 . . . and particularly § 2(c)(ii) [sic] of that Rule." He knew that most of Century's assets were outside Utah in December of 1975. (T–Gilliland, 3:102–05) It must have been obvious to him that the substantial part of Century's total assets of $700,000 as of March 15, 1976, consisted of real property located outside Utah. Thus, knowing that Century did not meet the 80% requirement, Gilliland represented to the Utah Securities Commission and investors that Century had complied with Rule 147.

This second $250,000 issue of notes began selling prior to the approval of the April prospectus. (Exhibit 16). Although $250,000 of this issue had been sold by about May 20, Century continued selling its notes without interruption throughout May and June. (Exhibit 16). On June 15, a third prospectus was approved. (Exhibit 9). It amended the second prospectus to increase the second offering to $750,000. It contained Century's financial statement as of May 15, 1976, prepared by Singer. This statement contained the fraudulent infor-

mation concerning real estate holdings and contract receivables that appeared in the March 15 statement. In addition, it included as an asset $25,100 of "Investments." Note 7 of the financial statement indicated that Century had "purchased all of the outstanding common stock of MED–IDENTS, LTD. (a Utah corporation) for $25,100. Payment was made with a $16,100 cash payment and by issuing a $9,000 note payable." (Exhibit 9, page 15). This directly contradicted Gilliland's statement in the prospectus that Century had no subsidiaries and was not affiliated with any other companies.

More serious, however, was the failure to disclose the fact that the $16,000 was paid to investors Kearney had defrauded in connection with Med–Idents and that Kearney had been indicted for such fraud. Lightner testified that Gilliland told him in February that Kearney had been indicted for acts related to Med-Idents. (Depo-Lightner at 26–30). Gilliland admits that he knew in early April of Kearney's criminal fraud prosecution. (T–Gilliland, 3:143–44). Thus, when the amended prospectus was issued on June 15, Gilliland knew that Century's sole shareholder, director, and controlling person had been criminally indicted. The financial statement in the prospectus included Med-Idents as an asset of Century, yet Gilliland failed to disclose the material fact that criminal charges were pending against Kearney based on his activities in connection with Med-Idents in Arizona.

The June 15 amended prospectus, prepared by Gilliland, contained most of the misrepresentations made in the earlier prospectuses. Again, the notes were falsely represented to be secured. Again, Century's affiliation with Gateway was not disclosed, nor was the fact that Century was buying contracts created by Gateway. Century's affiliation with Computer-Idents, incorporated by Gilliland on May 19, was not disclosed.

Of particular importance was the failure to disclose that Kearney had diverted at least $190,000 of Century's funds to his personal use. This was accomplished by a $60,000 check on April 1 from Century to Gateway and a $130,000 check on May 20, also from Century to Gateway. (Exhibit 14). Both checks were signed by Kearney. These funds were transferred from Gateway to Kearney and distributed to the personal credit of Kearney, Kearney, Jr., and Kearney's "wife," Jean Halderman. (T–Korb, 4:141–45). It is not clear whether any persons other than these three were aware of this appropriation of funds prior to the June 15 amended prospectus. (Exhibit 9).

The June 15 amended prospectus was also fraudulent in that it represented that Michael Russell was president of Century, but failed to disclose that he was a mere figurehead. Russell was a salesman of notes for Century beginning in December, 1975. In April, 1976, he "was given the title of president" and retained that title until he submitted his written resignation on January 13, 1977. (T–Russell, 2:119; Exhibit 23). Kearney asked Russell to be president, telling Russell that he would continue to act as a salesman and would gradually receive more responsibility until he would eventually act as president. (T–Russell, 2:120–21; Exhibit 23). Russell did take over the responsibility of supervising the other salesmen. Aside from that function, his role in Century remained that of a salesman. He was never allowed to write checks or to look at Century's records. (T–Russell, 2:140–41). He was not allowed to make or participate in any management-level decisions. (Exhibit 23). No one asked Russell's permission for any action by Century. (T–Russell, 2:151). Gilliland handed documents to Russell to be signed, but Russell did not know what he was signing. (Id. at 137). Hugh Hall, Century's bookkeeper and secretary-treasurer, also testified that Russell "really didn't have the official position as to know what was going on." (T–Hall, 4:61).

Kearney continued to control Century after March, 1976. He had unrestricted access to Century's funds. He directed the affairs of Gateway, Med-Idents, and Computer-Idents. Gilliland was aware of these facts. He filed the articles of incorporation

for the latter corporations at Kearney's request. He knew that Med-Idents was to be a subsidiary of Century. Gilliland knew that Kearney was disbursing Century's funds because Kearney signed the checks from Century for Gilliland's legal fees on May 11 and 28, 1976. (Exhibit 49).

Kearney began serving his federal sentence for wire fraud in the summer of 1976. Gilliland testified that he first learned that Kearney was in jail in July and that he had learned of Kearney's indictment in April. (T–Gilliland, 3:143). Gilliland never disclosed these facts to the Utah Securities Commission. He also failed to inform Singer of these facts. Instead, Singer heard from another source that Kearney was in jail and asked Gilliland to verify that fact. Gilliland responded that he could not tell because of his attorney-client relationship with Kearney. (T–Singer, 2:62). On or about August 15, Gilliland and Kearney, Jr. met with Russell at a motel in California, where Russell was vacationing with his family, and informed Russell that Kearney was in jail. During this conversation, Gilliland told Russell that one of their "options" was to notify the Securities Commission that Kearney was in jail and to refund investors' money. (T–Russell, 2:148). They discussed the fact that this action would result in the collapse of Century. (*Id.* at 148–49). This option was apparently rejected since no such disclosure was ever made. They also discussed the option of arranging for Russell, Gilliland, Kearney, Jr., and another person to purchase Century from Kearney and take over its operation. (*Id.* at 149). It is not clear whether any steps were taken toward the execution of this option. In any event, no such sale was consummated.

By the middle of August, 1976, Gilliland had learned that Kearney had appropriated $190,000 of Century's funds. (Post-trial Memorandum of Defendant Gilliland at 8; T–Gilliland, 3:107, 118, 138–39). Despite his knowledge of this fact and the fact that Kearney was in prison for fraud, Gilliland, with the assistance of Kearney, Jr., diverted $45,000 of Century's funds to the personal use of Kearney and Gilliland. This was accomplished by several steps, all performed on August 20. First, Kearney, Jr. signed a Century check for $45,000, payable to Century Construction, Inc. (Exhibit 45). Century Construction was never incorporated (Exhibit 59) although Gilliland testified that he caused it "to be filed in the summer of 1976 at the request of Hugh Hall." (T–Gilliland, 3:119). This check was deposited in a bank account that had previously been opened in the name of Century Construction, using Century's address and telephone number. Secondly, a check for $45,000 was drawn on Century Construction's account, signed by Kearney, Jr. and payable to Gilliland. (Exhibit 48). Thirdly, Gilliland endorsed the second check and used it to purchase two cashier's checks: one for $30,000 payable to James Alle and one for $15,000 payable to Gilliland. (Exhibit 46). Alle was a California attorney supposedly representing Kearney in connection with a criminal matter. His check was negotiated on August 23. Gilliland's check was not negotiated until September 16, when Gilliland undisputedly knew that Kearney had appropriated $190,000 from Century. (T–Gilliland, 3:107, 118, 138–39).

Gilliland knew that these transactions were fraudulent as to Century and its investors. Century Construction was merely a name on a bank account—a device intended to conceal the diversion of $45,000. Although Gilliland testified that these funds were channeled through Century Construction at the direction of Hugh Hall "for accounting purposes" (*Id.* at 128–29), Hall testified that he had no conversation with Gilliland on that subject. (T–Hall, 4:65–66). Hall's testimony is corroborated by the fact that his employment with Century had terminated about two months before this transaction occurred. (*Id.* at 36, 62). Singer testified that in October, 1976, he met with Rex Parsons, who had at that time purchased Century. Parsons told Singer that this $45,000 had been stolen from Century. (T–Singer, 2:57). A week later Singer met Gilliland and asked whether the $45,000 had been stolen. Thereupon, Singer, Gilliland, and Parsons had a conversa-

tion, the purpose of which was for Gilliland to explain the $45,000 transaction to Parsons. Singer testified that Gilliland said $15,000 of it was for his legal fees. (*Id.* at 69–70). At trial, however, Gilliland testified that the $15,000 was a loan from Century that was authorized by Kearney, Russell, and Hall. (T–Gilliland, 3:120–21). Neither Russell nor Hall was able to recall having authorized such a loan. (T–Russell, 2:150; T–Hall, 4:65–66). Gilliland testified that he executed a promissory note to Century for $15,000 (T–Gilliland, 3:132), but no copy of such a note was found either in Century's or Gilliland's records. As of the date of trial, Gilliland had not repaid any part of the $15,000 "loan." (*Id.* at 125). Although Kearney signed a promissory note for $45,000 to Century Construction dated August 20, 1976, the note was stamped "cancelled" and again signed by Kearney, apparently on the same date. (Exhibit 47). Gilliland must have known that there was virtually no possibility of recovering the $30,000 paid to Kearney's attorney in California when Kearney already owed Century $190,000. He clearly knew that the entire $45,000 was expended for uses grossly at variance with the purposes stated in the prospectuses. Gilliland ignored his own advice given in a letter to Century's board of directors on December 4, 1975, stating that Century "must comply absolutely with the terms of the offering circular and registration statement. Any deviation or change must be reported to the State Securities Commission in advance." (Exhibit 44).

In late September of 1976, Rex Parsons "purchased" Century from Kearney. Gilliland testified that he was fired on September 30, 1976. (T–Gilliland, 3:99). Gilliland's involvement in Century's affairs appears to have ended at that point. Century continued selling notes at least until November 30, 1976. (Exhibit 16). During the twelve-month period of Century's public offering of notes, over $970,000 worth of notes (face value) were sold, generating total proceeds of about $868,000. (Exhibit 16; Korb Affidavit at 3). When Parsons took over Century, it had about $92,000 in its bank account. (Korb Affidavit at 23). Af-

ter his assumption of control, Century received over $187,000 from the sale of notes. (*Id.*) Parsons diverted at least $146,000 of Century's funds for unrelated business and personal expenses and expended a total of $300,000 of Century's funds. (T–Korb, 5:13–23). The SEC began investigating Century in September, 1976, but did not file suit until February, 1977, when Century's assets had been almost completely dissipated.

In short, Century was the vehicle used by Kearney, Kearney, Jr., Parsons, and others to defraud investors of nearly one million dollars within a period of little more than one year. The foregoing exposition of facts is not an exhaustive enumeration of the fraudulent acts, representations, and omissions of Century and its agents that are disclosed by the evidence. Nor is the foregoing an exhaustive treatment of the particulars in which Century's sale of notes violated the registration requirements of the federal securities law. However, the facts described above, which are clearly supported by the evidence, compellingly establish violations by Century of antifraud provisions of the federal securities law.

Century failed to comply with Rule 147 in its sale of notes. As discussed previously, the bulk of its assets was located outside Utah during most of the period during which the notes were sold. The selection of September 30, 1975, as the end of Century's first semi-annual fiscal period was a sham whose sole purpose was the avoidance of federal securities registration rules. The evidence also shows that far less than 80% of the net proceeds of the sale of notes was used in connection with the operation of a business or the purchase of real property within Utah. Indeed, it appears that over 50% of the net proceeds was appropriated for the personal use of Kearney, Parsons, and other individuals. (T–Korb, 4:142–50; 5:13–23). In addition to these failures to satisfy Rule 147, the evidence establishes that notes were sold to persons other than residents of Utah. (Depo–Jackson at 14–17; Exhibit 64; Exhibit 32). These facts not only preclude an exemption under Rule 147,

but they also preclude an exemption under section 3(a)(11) of the Securities Act of 1933, 15 U.S.C. § 77c(a)(11). *E. g., Securities and Exchange Commission v. Van Horn,* 371 F.2d 181 (7th Cir. 1966); *Capital Funds, Inc. v. Securities and Exchange Commission,* 348 F.2d 582 (8th Cir. 1965).

The evidence establishes beyond any doubt that Century violated section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Rule 10b–5, 17 C.F.R. § 240.-10b–5, promulgated under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The actions and representations of Century, from its inception throughout its entire period of business activity, were grossly fraudulent and deceptive. There is no doubt as to their materiality.

## PROPRIETY OF AN INJUNCTION AGAINST GILLILAND

■ The SEC seeks a permanent injunction restraining Gilliland from engaging in acts constituting violations of the registration and antifraud provisions of the 1933 and 1934 Acts. As prerequisites to such relief, the SEC must prove that there is a reasonable likelihood that Galliland will commit future violations of one or more of those provisions. *E. g., Securities and Exchange Commission v. Southwest Coal & Energy Co.,* 439 F.Supp. 820, 825 (W.D.La. 1977).

The parties have stipulated in the pretrial order that federal jurisdictional means, including the mail system, were employed in the offering and sale of debt securities and that no federal registration of such securities was ever in effect. The court has determined that Century failed to satisfy either Rule 147 or the general statutory intrastate exemption. Thus, Century violated sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c).

The facts related above show that Gilliland, as counsel for Century, was the person primarily responsible for ensuring that Century complied with the securities laws. He prepared the prospectuses and submitted them and other registration materials to the Utah Securities Commission. He directly or indirectly represented to the Commission that Century's debt securities were exempt from registration by virtue of Rule 147. This representation was made in each prospectus: December 8, April 2, and June 15. On December 8, Gilliland knew that the bulk of Century's assets was not located in Utah. (T–Gilliland, 3:102–05). Knowing that Rule 147 required 80% of Century's assets to be in Utah, Gilliland advised Kearney to designate September 30, 1975, as the end of Century's first semi-annual fiscal period. (T–Gilliland, 3:65, 71). As discussed previously, this fiscal period designation was a sham. Gilliland, in defense of his actions, maintains that Century had started operating as a de facto corporation in March, 1975. (*Id.* at 67–69). The record, however, does not sustain that conclusion. (T–Korb, 4:94–95). In addition, Gilliland maintains that Century was entitled to arbitrarily select any fiscal period whatsoever. (T–Gilliland, 3:75–79, 104). The court, however, is persuaded to the contrary. Rule 147 was not intended to provide a means of circumventing federal securities registration requirements through the arbitrary selection of a fiscal period to disguise the fact that nearly all of the issuer's assets are located outside the state in which the securities are sold. In an analogous context, it is clear that the rule "shall not be available to any person with respect to any offering which, although in technical compliance with the rule, is part of a plan or scheme by such person to make interstate offers or sales of securities." 17 C.F.R. § 230.147, preliminary note 3.

Moreover, Gilliland's arguments patently provide no justification for his representations in the April and June prospectuses that the securities were exempt under Rule 147. For both of those prospectuses the relevant fiscal period had ended March 31, 1976, when most of Century's assets were outside Utah—a fact unquestionably known to Gilliland.

Certain portions of the deposition of Roy J. Jackson, salesman for Century, were read into evidence. This testimony shows that

Gilliland met with Kearney and Jackson in March of 1976. At that meeting Jackson inquired whether he could sell a note to two persons jointly if one of them was not a resident of Utah. Gilliland advised Jackson that he could sell the note as long as one of the buyers was a resident of Utah. (Depo-Jackson at 14–18). In reliance on this advice, Jackson made such a sale. Payment was made April 1 with a check drawn on a California bank, and the note was issued April 4 to two persons, one of whom was a resident of California. (Exhibit 64). Gilliland's role in this sale and his involvement in advising Century generally and in preparing its prospectuses sustain the conclusion that Gilliland aided and abetted Century in violating sections 5(a) and 5(c) of the 1933 Act.

With regard to the antifraud rules, the facts discussed above manifest that Gilliland was a material participant in Century's fraudulent securities transactions. As counsel he was responsible for the legal work done reflecting the facts he knew about. He prepared the prospectuses containing numerous fraudulent representations and omissions. Although Gilliland was apparently unaware of many of the particulars in which the financial statements were fraudulent, he was clearly aware that the notes being offered and sold were unsecured, contrary to his representations in the prospectuses. In the April and June prospectuses Gilliland, with knowledge of facts to the contrary, represented that Century was not affiliated with any other companies and had no subsidiaries. Knowing of federal fraud charges against Kearney, Gilliland deliberately failed to disclose such information even though Kearney, as Gilliland well knew, remained in control and ownership of Century. Gilliland failed to disclose that Russell was not in reality the president of Century but was a mere figurehead.

Even when Gilliland knew that Kearney was in federal prison for having defrauded investors and that Kearney had appropriated at least $190,000 of invested funds from Century, he failed to disclose these facts. Instead, he permitted Century to continue selling notes to unsuspecting investors and proceeded to channel $45,000 of invested funds to himself and Kearney's California attorney by way of a non-existent corporation. This was a fraud upon Century's investors whether or not Gilliland intended to repay that portion of the money that he received.

In addition to these actions, the evidence shows that Gilliland contributed to Century's fraudulent affairs in other respects. He prepared an opinion letter to Singer (Exhibit 8) stating that Kearney's affidavit of value could be relied upon as a valid source document regarding Arizona real property contributed to Century by Kearney for stock. Singer relied upon this letter and in turn upon Kearney's false affidavit in preparing Century's certified financial statements. As a result Singer failed to probe the transactions deeply enough to discover undisclosed price reductions and encumbrances of over $300,000.

Gilliland also attended sales meetings held by Century for the purpose of instructing officers and sales personnel concerning use of the prospectuses. He reviewed for accuracy a document called "The Most Frequently Asked Questions About Century Capital Notes" (Exhibits 36A and 36B) and submitted it to the Utah Securities Commission for approval as sales literature. This document represented that "[t]he proceeds from the sale of Century Capital Notes are invested in real estate instruments which assure CENTURY MORTGAGE CO., LTD. of having a secure position in all these transactions." It also stated that Century had pledged as security for the notes all of its assets as of October 31, 1975. In fact, as Gilliland knew, Century's assets were not pledged as security in any legally significant manner and its funds were applied to uses that gave Century little or no security. Finally, the evidence suggests that Gilliland acted in a managerial capacity for Century during his last several months as counsel. Various witnesses testified that Gilliland and Kearney, Jr. seemed to be in charge of Century's affairs at that time. (T–Korb, 4:80; Depo-Burton at 17).

In short, the evidence clearly shows that Gilliland violated Rule 10b–5 promulgated under section 10(b) of the Securities Exchange Act of 1934 and aided and abetted Century in violating section 17(a) of the Securities Act of 1933. Gilliland's principal defense appears to be that he lacked scienter. It has been held that scienter is not a necessary element of a violation of section 17(a) of the 1933 Act. *Securities and Exchange Commission v. Southwest Coal & Energy Co.*, 439 F.Supp. 820, 827 (W.D.La. 1977). In any event, the court's conclusion that Gilliland made material false representations and was responsible for material omissions with knowledge of their misleading character establishes the presence of scienter for purposes of Rule 10b–5 and section 17(a).

With respect to Gilliland the only question remaining is whether there is a reasonable likelihood of future securities law violations. Gilliland testified that he, as a lawyer, gives securities advice and represents clients in filing matters with the Utah Securities Commission and the SEC. Thus, the opportunity for future violations is readily apparent. Although Gilliland was not connected with Century at the time this action was brought, he was closely involved with Century at the time the SEC began investigating Century. Moreover, he did not voluntarily withdraw from his involvement with Century but was fired.

Gilliland's lack of candor as a witness further supports the inference that there is a reasonable likelihood of future violations. His testimony was frequently evasive or argumentative and was repeatedly contradicted by the testimony of other witnesses (Hall, Russell, Singer, Jackson, Lightner, and O'Reilly) on material points. Gilliland's unreasonable refusal to recognize many of Century's actions as fraudulent and his incredible assertion that he was unaware of Century's fraudulent conduct also suggest a likelihood of future violations.

The fraudulent nature of many of Gilliland's actions on behalf of Century indicate a risk of repeated abuse of his position of public trust and responsibility as a legal officer in securities transactions. The evidence clearly shows that over $750,000 of Century's notes were sold after March 1, 1976. (T–Korb, 5:23). Prior to that date Gilliland knew that Kearney was charged with criminal fraud. Gilliland knew of Kearney's central role as owner and controlling person of Century. As counsel for Century, he had a public duty to inform state and federal securities officials of Kearney's indictment. His failure to carry out this duty and his preparation of two subsequent fraudulent prospectuses for Century resulted in enormous losses to investors—losses Gilliland could probably have prevented with a single telephone call. The court is persuaded that the evidence shows a reasonable likelihood that Gilliland will commit future violations of the securities laws if not enjoined therefrom.

## WHITE'S INVOLVEMENT WITH CENTURY

In comparison with Gilliland, White's role in Century's affairs was small. White was never an officer, director, or employee of Century. The evidence, however, reveals three significant transactions in which White dealt with Kearney and/or Century, either in his own right or as one of two partners in a partnership called O'Brien and Associates (hereinafter O'Brien).

One of these transactions involved certain land located in Sanpete County, Utah. On August 25, 1975, O'Brien entered into a contract to purchase 225 acres in Sanpete County from a Mr. and Mrs. Vander Meide for $10 down and $650 per month, with a total price of $50,625. (Exhibit B). On December 23, 1975, Vander Meide and White (on behalf of O'Brien) signed an "addendum" releasing O'Brien from its obligation to purchase a portion of the property. (Exhibit B–1). Under this new agreement, O'Brien was to purchase only 120 acres of the land for $25,975, of which $9,302 had theretofore been paid.

In the meantime, O'Brien and Associates had entered into real estate contracts for the sale of the same 120 acres. Under the first, dated August 27, 1975, 40 acres were

**312**

to be conveyed to Mr. and Mrs. Wayne Smith upon payment of $18,000. (Exhibit C). O'Brien sold its interest in the Smith contract in October or November of 1975 to a couple named Wade. (Exhibit D). Vander Meide then received payment for the 40 acres and released that parcel from his contract with O'Brien. (T–White, 5:50–51). Under the second contract, dated August 30, 1975, O'Brien sold another 40 acres to a Mr. and Mrs. Gray for $18,000. (Exhibit 52). Under the third, dated October 10, 1975, O'Brien sold the remaining 40 acres to a Mr. and Mrs. Clyde for $18,000. (Exhibit 53).

White testified that O'Brien assigned the Gray and Clyde contracts to Century for $3,500. (T–White, 5:54–55). No documents representing such assignments are in evidence. However, a letter of intent dated December 24, 1975, and signed by White (for O'Brien) and Kearney (for Century) indicates that O'Brien agreed to "sell" all three 40–acre parcels to Century and to "assign the existing Real Estate Contracts" to Century for the "agreed upon price of $1,000.00." (Exhibit 51). Kearney issued a Century check on the same date for $1,000 to O'Brien. (Exhibit 55). This check was marked "loan" and was endorsed and negotiated by White on the same date.

Although a Century check for $2,500 (marked "loan") had been issued to O'Brien on November 12 (Exhibit 56), the court is not persuaded that it was received in payment for the Gray and Clyde contracts. The December 24 letter (Exhibit 51) signed by White clearly indicates that the total consideration for the assignment of the three contracts was $1,000, and a check in that amount was given at that time. This is consistent with White's statement to SEC investigators prior to the filing of this action. (T–Korb, 5:11–12). At that time he was unable to explain the purpose of the $2,500 check. He did explain at that time that the $1,000 check was the consideration for assigning the Gray and Clyde contracts to Century. (Id.) White's explanation at trial for the $2,500 check was that it was originally a loan to O'Brien for payroll purposes and that the loan was satisfied as part

of the consideration for the contract assignments. (T–White, 4:112, 113, 120). The actual purpose of the $2,500 check is not clearly ascertainable from the record, but the court is doubtful that it was in fact a loan because no promissory note was signed and no terms for a loan were testified to. Both the $2,500 and the $1,000 "loans" were ultimately included on Century's financial statements as loan receivables. Some or all of the three contracts were apparently included as contract receivables.

White's role in assigning the contracts on the 120 acres to Century (Exhibit 51) was fraudulent because he had previously sold all of O'Brien's title and interest in the Smith parcel to the Wades. (Exhibit D). White's role in the Clyde contract was also questionable in that he induced the Clydes to sign the contract in blank, without having seen the property, at a time when Mr. Clyde was intoxicated. (T–Clyde). The Clydes did not maintain payments under the contract. (Id.) Finally, it should be noted that the contract price in each of the three contracts was more than twice the price at which Vander Meide, a professional real estate broker and dealer, had sold the land to O'Brien only a few days or weeks before the contracts were signed. This fact casts serious doubt on the adequacy of the land's value as security for the contracts assigned to Century by White.

The second transaction involving White and Kearney occurred in September, 1975. Early in September Ben S. Aoyagi entered into an agreement to purchase a lot in the Aspen Hills subdivision in Sanpete County, Utah from Aspen Hills Corporation. (T–Aoyagi; Aoyagi's Affidavit). White, who was then employed by Aspen Hills, acted as sales agent in that transaction. Aoyagi signed an installment contract as a method of financing the purchase. About a week later Aoyagi contacted White to ascertain the lowest price at which he could pay off the contract. Although the amount owing on the contract was $5,760, White informed Aoyagi that this amount would be discounted to $5,100. Aoyagi responded that he would have a check ready in that amount,

and White agreed to pick it up at Aoyagi's place of business the next day. (*Id.*) Aoyagi immediately secured a cashier's check for $5,100 payable to Aspen Hills Corporation. (Exhibit 28). The next day, September 18, Kearney (with whom Aoyagi apparently had no prior acquaintance) came to Aoyagi's place of business and persuaded Aoyagi to invest the $5,100 in a first mortgage to be assigned him by Century. An agreement to that effect was signed by Aoyagi and Kearney. (Exhibit 29). White arrived at Aoyagi's place of business while Kearney was there. White and Kearney pretended not to know each other, and the change in plans was "explained" to White. (T-Aoyagi; Aoyagi Affidavit). The Aspen Hills check was then returned to the bank and replaced with a $5,100 check to Century, which was given to Kearney. (Exhibit 30). Aoyagi never received a first mortgage assignment from Century. (T-Aoyagi). Kearney orally promised to make the payments on Aoyagi's contract with Aspen Hills until a mortgage was assigned to Aoyagi. (*Id.*) These payments were made by Century or Gateway Valley Estates for about twelve months. Thereafter, Aoyagi paid the balance owing on the contract.

It is not disputed that the agreement between Aoyagi and Century was an investment contract and therefore a security. White contends that he was not a part of Kearney's sale of the investment contract to Aoyagi. He, in effect, urges upon the court that Kearney's arrival at Aoyagi's place of business at the precise moment when Aoyagi had $5,100 in hand, but before White came to pick it up, was pure coincidence. On the contrary, it seems apparent that White informed Kearney that Aoyagi had the money. White arrived while Kearney was there and Aoyagi was persuaded to invest his money with Century. Kearney gave White a Century check for $50 (marked "sales expense") as a commission for White's services in this transaction. (Exhibit 54). The court does not accept White's contention that this payment was an unexpected gratuity. White testified that it was a commission. (T-White, 5:85-86). The court finds that White was a material participant in the sale of an unregistered security to Aoyagi, which ultimately resulted in the perpetration of a fraud upon Aoyagi.

The third transaction between White and Century has been briefly described above. On October 25, 1975, White paid Vander Meide $10 for a 60-day option to purchase 80 acres of land in Millard County, Utah for $4,800. (Exhibit 50). On October 28 White, purporting to subdivide the 80 acres into nine parcels, prepared nine uniform real estate contracts to convey the land to O'Brien and Associates upon payment of $48,000. (Exhibit 4). On October 29, White assigned his right to receive payments from O'Brien under these nine contracts to Kearney. (*Id.*) Also on October 29, Kearney assigned these rights to Century. (*Id.*) White maintains that he received no consideration for these assignments. (T-White, 5:68-71). White never exercised the option to buy the 80 acres from Vander Meide. (*Id.*) Although the option did not expire until December 25, O'Brien and Associates apparently made no effort to make the December 15 payments due on each of the nine contracts and Century apparently made no effort to collect the payments. These facts indicate that this entire series of paper transactions was a sham without economic substance. The parties (other than Vander Meide) never intended to carry out the contracts. The contract price was eight to ten times the value of the land, which Vander Meide later sold for $80 per acre.

When Singer prepared Century's October 31 and subsequent financial statements, he included $43,200 as contract receivables based on these nine contracts. (T-Singer, 1:52). In doing so Singer relied upon a telephone conversation with White on November 13, 1975. (*Id.* at 53-54). Singer called White on that date and informed White that he was auditing Century's books, that he needed to verify the purchase price paid for the contracts, and that they were on the books at $43,200. Singer asked whether Kearney had paid White $43,200 for the contracts, to which White replied

that the contracts had been paid in full by Kearney and that there was nothing owing on them. (*Id.*) White said that Kearney had paid whatever he said he paid for the contracts. (*Id.*, 2:74–75). This response was inexcusably misleading and known by White to be false. White denies that this conversation occurred, but the court finds Singer's testimony to be considerably more reliable than White's under the circumstances and based on their credibility as indicated by other evidence.

The court thus concludes that the Millard County land transactions were a fraudulent device without economic substance, the purpose of which was to create the false appearance that Kearney had contributed substantial assets to Century. White was intimately involved with these transactions and knew of their fictitious character. He also must have known that these contracts would be relied upon by Singer and in turn the public as bona fide assets of Century. Regardless of whether White informed Kearney that he could not or would not exercise the option to buy the land, White's false representations to Singer as to consideration paid for the contracts was a highly material element of a scheme to defraud investors.

## PROPRIETY OF AN INJUNCTION AGAINST WHITE

The SEC seeks injunctive relief of the same scope against White as against Gilliland. The facts discussed above demonstrate clearly that White's actions were in violation of antifraud provisions of the federal securities laws. In the Millard County and Sanpete County land transactions in which White dealt with Kearney or Century, the evidence reveals guilty knowledge or fraudulent intent on the part of White. There is substantial evidence supporting the inference drawn by the court that White knew or had reason to know that Kearney and Century were involved in selling securities and that his dealings with Kearney and Century were being used to create the false appearance that Century owned substantial assets. Thus, the element of scienter is

satisfied. The evidence shows that White aided and abetted Century in violating section 17(a) of the 1933 Act and that he violated Rule 10b–5 under the 1934 Act.

White's role in the Aoyagi transaction, in itself an illegal sale of a security, as well as his role in the other transactions, supports the court's conclusion that White also aided and abetted in violations of sections 5(a) and 5(c) of the 1933 Act.

The evidence adduced at trial gives rise to the inference that there is a reasonable likelihood that White will commit future violations of these securities laws if not enjoined therefrom. The fraudulent character of his activities with regard to Century lend support to this conclusion, as does the incredible nature of some of his testimony. At the time this action was brought White was employed by Fruit Juice Corporation, which was owned by Rex Parsons—at that time the owner of Century. (T–White, 4:125). Parsons diverted substantial amounts of Century's funds to Fruit Juice and other businesses he owned. (T–Korb, 5:13–23). Thus, it appears that White has continued to be involved with Century personnel and Century funds up to the time of this action. The evidence before the court and reasonable inferences drawn therefrom suggest the need for an injunction against future violations by White.

IT IS THEREFORE ORDERED that the SEC's motion for preliminary and permanent injunctions enjoining defendants Gilliland and White from further acts constituting violations of sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 and section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, is granted. Judgment by way of injunctive relief as sought in the SEC's complaint herein is granted and will be reflected in a separate injunction signed by the court.